UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       -v.-

KONSTANTIN MALOFEYEV,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - x

*Superseding*

SEALED INDICTMENT

S1 21 Cr. 676 (LAK)

## COUNT ONE
### (Conspiracy to Violate the International Emergency Economic Powers Act)

The Grand Jury charges:

### The Defendant

1.   KONSTANTIN MALOFEYEV, the defendant, is a Russian national who was at all relevant times the owner and managing partner of Marshall Capital Partners, which was a Russian equity investment group. On or about December 19, 2014, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated MALOFEYEV as a Specially Designated National ("SDN"). In so designating MALOFEYEV, OFAC explained that MALOFEYEV was one of the main sources of financing for Russians promoting separatism in Crimea, and was designated as an SDN because he was responsible for or complicit in, or has engaged in, actions or polices that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine and has materially assisted, sponsored, or provided financial, material,

or technological support for, or goods or services to or in support
of the so-called Donetsk People's Republic.

## The International Emergency Economic Powers Act and the Relevant Sanctions Orders and Regulations

2.   The International Emergency Economic Powers Act
("IEEPA"), codified at Title 50, United States Code, Sections 1701-
1708, confers upon the President authority to deal with unusual
and extraordinary threats to the national security and foreign
policy of the United States. Section 1705 provides, in part, that
"[i]t shall be unlawful for a person to violate, attempt to
violate, conspire to violate, or cause a violation of any license,
order, regulation, or prohibition issued under this chapter." 50
U.S.C. § 1705(a).

3.   In 2014, pursuant to his authorities under the
IEEPA, the President issued Executive Order 13660, which declared
a national emergency with respect to the situation in Ukraine. To
address this national emergency, the President blocked all
property and interest in property that were then or thereafter
came within the United States or the possession or control of any
United States person, of individuals determined by the Secretary
of the Treasury to meet one or more enumerated criteria. These
criteria include, but are not limited to, individuals determined
to be responsible for or complicit in, or who engage in, actions
or policies that threaten the peace, security, stability,

sovereignty, or territorial integrity of Ukraine; or who materially assist, sponsor, or provide financial, material, or technological support for, or goods or services to, individuals or entities engaging in such activities. Executive Order 13660 prohibits, among other things, transferring, paying, exporting, withdrawing, or otherwise dealing in any interest in property in the United States owned by a person whose property and interests in property are blocked (a "blocked person"), as well as the making of any contribution or provision of funds, goods, or services by a United States person, to, or for the benefit of a blocked person, and the receipt of any contribution or provision of funds, goods, or services by a United States person from any such blocked person.

4.     The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine has remained in continuous effect since 2014, and was most recently continued on March 2, 2022.

5.     The President on multiple occasions has expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addresses the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addresses the actions and policies of the

Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine. Executive Orders 13660, 13661, and 13662 are collectively referred to as the "Ukraine-Related Executive Orders." On February 21, 2022, the President again expanded the scope of the national emergency, finding that the Russian Federation's purported recognition of the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine contradicts Russia's commitments under the Minsk agreements and threatens the peace, stability, sovereignty, and territorial integrity of Ukraine.

6. The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as may be necessary to carry out the purposes of those orders. The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States Government.

7. To implement the Ukraine-Related Executive Orders, OFAC issued certain Ukraine-Related Sanctions Regulations. These regulations incorporate by reference the prohibited transactions set forth in the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.201. The regulations also provide that the names of persons designated directly by the Ukraine-Related Executive Orders, or by

OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests are therefore blocked, are published in the Federal Register and incorporated into the SDNs and Blocked Persons List (the "SDN List"), which is published on OFAC's website. *Id.* Note 1.

8. According to the Ukraine-Related Sanctions Regulations, a person whose property and interest in property is blocked pursuant to the Ukraine-Related Executive Orders is treated as having an interest in all property and interests in property of any entity in which the person owns, directly or indirectly, a 50 percent or greater interest. *See* 31 C.F.R. § 589.406. Accordingly, such an entity is deemed a person whose property and interests in property are blocked, regardless of whether the name of the entity is incorporated into OFAC's SDN List. *Id.*

9. On or about December 19, 2014, OFAC designated KONSTANTIN MALOFEYEV, the defendant, as an SDN pursuant to Executive Order 13660.

### The Sanctions Violations

10. From at least in or about 2013, through at least in or about 2018, KONSTANTIN MALOFEYEV, the defendant, employed John Hanick, a/k/a "Jack Hanick" ("Hanick"), a United States citizen, to provide funds, goods, and services to and for the benefit of MALOFEYEV and companies owned and controlled by MALOFEYEV, and to

receive funds, goods, and services from MALOFEYEV. MALOFEYEV continued to receive funds, goods, and services from Hanick, and to provide funds, goods, and services to Hanick, after being designated as an SDN in December 2014 and in violation of the Ukraine-Related Sanctions Regulations, until at least the end of 2018.

11.    As part of the scheme to employ Hanick in violation of the Ukraine-Related Sanctions Regulations, KONSTANTIN MALOFEYEV, the defendant, used Hanick's assistance to transfer, and to attempt to transfer, interests in property in the United States owned by MALOFEYEV to a Greek associate of MALOFEYEV (the "Greek Business Partner"), in violation of the Ukraine-Related Sanctions Regulations.

MALOFEYEV Employs Hanick to Work on the Russian TV Network

12.    At all times relevant to this Indictment, KONSTANTIN MALOFEYEV, the defendant, was and had been the Chairman of the Board of Directors of a corporate group, which had a public website listing the Russian TV Network as one of its projects. The Russian TV Network also had its own website, which, as of the date of this Indictment, listed MALOFEYEV as the Founder of the Russian TV Network.

13.    Beginning in at least the first half of 2013, KONSTANTIN MALOFEYEV, the defendant, and associates of MALOFEYEV began corresponding with Hanick regarding MALOFEYEV's plan to

6

employ Hanick to work for MALOFEYEV on the Russian TV Network. On or about April 27, 2013, Hanick sent MALOFEYEV an email in which Hanick stated that he "came to Russia to work for you."

14.   In or about July 2013, Hanick moved to Russia. Prior to moving there, KONSTANTIN MALOFEYEV, the defendant, and Hanick negotiated the terms of Hanick's employment, including the salary Hanick would receive, the payment for his housing in Moscow, and his Russian work visa. In or about May 2013, MALOFEYEV sent an email to Hanick in which MALOFEYEV confirmed their agreement on Hanick's salary, a $5,000 monthly housing stipend, and health insurance, so that MALOFEYEV's attorney could prepare Hanick's "work contract for my visa." An attorney at MALOFEYEV's investment company, Marshall Capital Partners, subsequently emailed Hanick a draft employment contract between a separate Russian entity and Hanick, that reflected the terms that MALOFEYEV had agreed with Hanick.

15.   On or about December 19, 2014, OFAC designated KONSTANTIN MALOFEYEV, the defendant, as an SDN. Nonetheless, MALOFEYEV continued to employ Hanick on the Russian TV Network and Hanick continued to report directly to MALOFEYEV. In or about January 2015, Hanick sent MALOFEYEV a draft of a "[Russian TV Network] Board News Policy." Hanick wrote that the policy was meant "to implement your vision and to provide you with information for you to make decisions . . . You are the founder and chief architect

of the project. We, as board members have the responsibility to direct the staff to implement your instructions." Later in or about January 2015, Hanick sent an email to MALOFEYEV regarding the "Funding of [the Russian TV Network]," in which Hanick noted that "there is 0 money on our account" and "You said when we had a problem to contact you directly."

16.   The Russian TV Network went on the air in Russia in or about April 2015. Hanick was generally responsible for the technical and operational aspects of the Russian TV Network, pursuant to a plan developed with MALOFEYEV. For example, in or about August 2016, Hanick wrote an email to another Russian TV Network employee in which Hanick stated: "When we were with Konstantin, we agreed that we would discuss editorial function of new studio and only then create the technical task. . . . [another Russian TV Network employee] does editorial content without our interference, you do administrative and financial without interference, and I do production and operations."

17.   KONSTANTIN MALOFEYEV, the defendant, paid Hanick for his work for the Russian TV Network through two Russian entities. From in or about 2013 through in or about February 2016, MALOFEYEV arranged to pay Hanick through a Russian entity ("Russian Entity-1"), that had been listed as Hanick's employer on the employment contract MALOFEYEV had negotiated with Hanick. From in or about May 2016 through 2018, MALOFEYEV arranged to pay Hanick

through another Russian entity ("Russian Entity-2"). Although these entities nominally employed and paid Hanick, MALOFEYEV directly oversaw and was responsible for Hanick's employment and the payment of Hanick's salary. For instance, in or about May 2018, Hanick sent an email to MALOFEYEV, writing "At the end of May, I'll be finished with [Russian Entity-2]. This means that my visa to stay in Russia will end. We need help to stay. Can [Russian Entity-2] extended my employment without pay? My visa with them is through next April? Can you help? I'm sure the solution is simple." The salary payments MALOFEYEV made to Hanick were made to a Russian bank account in Hanick's name. However, Hanick returned some of these funds to the United States. In or about March 2017, Hanick wired a portion of the payments he had received from Russian Entity-2 from his Russian bank account to a bank account he held at a bank located in New York, New York.

### MALOFEYEV Employs Hanick on the Greek TV Network

18.    At the same time that he employed Hanick on the Russian TV Network, KONSTANTIN MALOFEYEV, the defendant, also directed Hanick to work on a project to establish and run a Greek television network (the "Greek TV Network") as a joint venture between MALOFEYEV and the Greek Business Partner. MALOFEYEV introduced Hanick to the Greek Business Partner in 2013.

19.    In or about November or December 2014, Hanick began traveling from Moscow to Greece to meet with the Greek Business

Partner and explore the idea of building a Greek television network that would partner with the Russian TV Network. KONSTANTIN MALOFEYEV, the defendant, had his personal assistants arrange and book Hanick's travel to and from Greece, and Hanick reported on his trips directly to MALOFEYEV. In or about December 2014, Hanick sent an email to MALOFEYEV and the Greek Business Partner to report on a visit that Hanick and the Greek Business Partner had made to a local television station in Greece, which Hanick referred to as "the station which we will own."

20.    In or about May 2015, Hanick relocated from Moscow to Greece to work primarily on the Greek TV Network, while continuing to work for the Russian TV Network as well. Shortly before the move, the Greek Business Partner wrote an email to Hanick stating that "Both K. and I want you in Greece."

21.    Hanick primarily resided in Greece from in or about May 2015 through in or about February 2016. During that time, Hanick reported regularly to KONSTANTIN MALOFEYEV, the defendant, on his work on the Russian TV Network and the Greek TV Network, and routinely emphasized the corporate synergy between the two networks. In or about November 2015, Hanick wrote to MALOFEYEV that the Greek TV Network was an "opportunity to detail Russia's point of view on Greek TV," and emphasized "our vision of cooperation." Also in or about November 2015, Hanick wrote to MALOFEYEV that "In order to facilitate the synergy between media

holdings, [the Russian TV Network] and [the Greek TV Network] shall provide all resources possible to help each other achieve their goals."

## MALOFEYEV Employs Hanick in an Attempt to Acquire the Bulgarian TV Network

22. Beginning in or about January 2015, KONSTANTIN MALOFEYEV, the defendant, directed Hanick to assist in MALOFEYEV's efforts to acquire a Bulgarian television network (the "Bulgarian TV Network"). Publicly, the Greek Business Partner claimed to be the person who was attempting to acquire the Bulgarian TV Network, but MALOFEYEV directed Hanick to recruit the Greek Business Partner to falsely pose as the purchaser, even as both Hanick and the Greek Business Partner were privately working on MALOFEYEV's behalf to acquire the network.

23. In or about January 2015, Hanick wrote in an email that KONSTANTIN MALOFEYEV, the defendant, had "asked me to go to Bulgaria to see the station, evaluate the equipment, and personnel." The following day, Hanick sent an email to an employee of MALOFEYEV's investment company Marshall Capital Partners to ask if they had contacted the prospective business partner in Bulgaria (the "Bulgarian Business Partner"). Hanick explained that "I must see the station before [the Bulgarian Business Partner's] visit to

11

Moscow on Tuesday. . . . Konstantin needs this information from me."

24.   After visiting the Bulgarian TV Network station in Bulgaria on or about February 5, 2015, Hanick wrote a report of his visit to KONSTANTIN MALOFEYEV, the defendant, including Hanick's recommendation that the Russian TV Network begin producing Russian language programming to be broadcast on the Bulgarian TV Network. On or about February 16, 2015, Hanick wrote to the Greek Business Partner, explaining that Hanick was with MALOFEYEV, who wanted Hanick to travel to Bulgaria the next day "to deal with bank to buy Bulgaria tv and restructure loan." Hanick went on to explain that the Greek Business Partner should send someone to travel with Hanick to help to conceal MALOFEYEV's role in the acquisition: "He asked me to ask you if someone from your company could come with me to talk to the bank since we understand you cannot go. The buyer should not be Russian but Greek. . . . Please call me or Konstantin directly."

25.   In or about April 2015, Hanick wrote an email to update KONSTANTIN MALOFEYEV, the defendant, on the Bulgarian TV Network negotiations, outlining the structure of the proposed deal. MALOFEYEV responded "No. It is wrong. I told you the correct way to follow in my office." Hanick replied "Thank you, We will proceed as your plan!" About two weeks after this exchange, the Bulgarian police raided the Bulgarian TV Network station to seize

equipment on behalf of its creditor bank. The day after the raid, Hanick sent MALOFEYEV a translation of a Polish-language news article that apparently reported that MALOFEYEV was rumored to be the true financier of the Bulgarian TV Network deal, despite the Greek Business Partner purportedly being the buyer.

<u>MALOFEYEV Employs Hanick to Transfer MALOFEYEV's Interest in
United States Property to the Greek Business Partner</u>

26.    In or about March 2014, KONSTANTIN MALOFEYEV, the defendant, made an investment of approximately $10 million to purchase shares of stock in a Texas-based bank holding company (the "Texas Bank" and the "Texas Bank Investment"). MALOFEYEV purchased his shares in the Texas Bank through a shell company incorporated in the Seychelles (the "Shell Company"). At the time he made the investment, MALOFEYEV's representatives provided the placement agent for the Texas Bank Investment with documentation showing that MALOFEYEV was the 100% ultimate beneficial owner of the Shell Company through various other corporate entities owned by MALOFEYEV. On or about March 31, 2014, the Texas Bank issued a certificate of shares listing the Shell Company as the owner of the shares.]

27.    After OFAC designated KONSTANTIN MALOFEYEV, the defendant, as a SDN in December 2014, the Texas Bank filed a blocked asset report with OFAC regarding MALOFEYEV's beneficial ownership of the certificate of shares in the name of the Shell

Company.

28.   In or about March 2015, KONSTANTIN MALOFEYEV, the defendant, began making plans to transfer beneficial ownership of the Shell Company to the Greek Business Partner, due to a request by the Greek Business Partner for capital to deal with a cash flow problem in the Greek Business Partner's business. On or about March 17, 2015, an employee of MALOFEYEV emailed a Texas attorney who had assisted MALOFEYEV in making the Texas Bank Investment, regarding a plan to change the "owner from our side."

29.   In or about May 2015, an attorney employed by KONSTANTIN MALOFEYEV, the defendant (the "MALOFEYEV Attorney") exchanged several emails with an attorney employed by the Greek Business Partner (the "Greek Business Partner Attorney"), regarding a plan to draft and sign a Sale and Purchase Agreement to transfer ownership of the Shell Company from MALOFEYEV to the Greek Business Partner, which would have the effect of transferring ownership of the Texas Bank Investment, in violation of the Ukraine-Related Sanctions Regulations.

30.   On or about June 8, 2015, the Greek Business Partner sent an email to the MALOFEYEV Attorney, the Greek Business Partner Attorney, Hanick, and a Russian accountant employed by KONSTANTIN MALOFEYEV, the defendant (the "MALOFEYEV Accountant"), in which the Greek Business Partner explained that he planned to use the Texas Bank Investment as "collateral . . . to obtain a bank

guarantee covering the payments due." The next day, Hanick replied to the Greek Business Partner and the other recipients stating "I will wait in Moscow one more day for documents. I will return to Greece on Wednesday." The Greek Business Partner responded to Hanick instructing him to "be in touch with" the MALOFEYEV Attorney and the Greek Business Partner Attorney and "make sure all necessary documents will be handed over to you."

31.   On June 10, 2015, Hanick flew from Moscow to Athens. On June 15, 2015, the Greek Business Partner Attorney sent an email to the MALOFEYEV Attorney and the MALOFEYEV Accountant, confirming that the Greek Business Partner had received a "copy of the share certificate" in the Texas Bank, which Hanick had brought to the Greek Business Partner from Moscow.

32.   On or about June 9, 2015, KONSTANTIN MALOFEYEV, the defendant, signed a Sale and Purchase Agreement purporting to transfer ownership of the Shell Company to the Greek Business Partner in exchange for "USD 1.00 (One US dollar)." The Sale and Purchase Agreement was printed with a blank space for the date of the agreement, and a handwritten date was added that falsely indicated that the agreement was made in July 2014, rather than in June 2015. However, the registry of ownership of the Shell Company reflects that MALOFEYEV owned the Shell Company continuously from when it was created until June 2015, and ownership was not

transferred prior to that time.

33.  On or about July 8, 2015, a representative of the Texas Bank sent an email to the MALOFEYEV Attorney stating that the Texas Bank Investment "constitutes 'blocked property'" because KONSTANTIN MALOFEYEV, the defendant, had been listed as a SDN, and that "as a result of this designation, Mr. Malofeev's property, and interests in property, within the United States must be frozen, and U.S. persons are generally prohibited from conducting any transactions with Mr. Malofeev." On or about July 10, 2015, the MALOFEYEV Attorney responded, asserting falsely that: "As far as I know, the ownership over [the Shell Company] was transferred by Mr. Malofeev to a third party (a new ultimate beneficial owner) at the beginning of July 2014, i.e. before the SDN designation." In truth, as MALOFEYEV and the MALOFEYEV Attorney well knew, the transfer of the Shell Company was executed in June 2015, at approximately the same time as Hanick physically delivered a copy of the Texas Bank certificate of shares to the Greek Business Partner and after the designation of MALOFEYEV as an SDN.

### Statutory Allegations

34.  From at least in or about December 2014, up to and including at least in or about December 2018, in the Southern District of New York and elsewhere, KONSTANTIN MALOFEYEV, the defendant, with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with

16

each other, to violate the IEEPA, in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

35. It was a part and an object of the conspiracy that KONSTANTIN MALOFEYEV, the defendant, and others known and unknown, would and did willfully and knowingly violate the IEEPA, and the regulations promulgated thereunder, to wit, MALOFEYEV and his co-conspirators willfully and knowingly caused United States persons to provide funds, goods, and services to and for the benefit of MALOFEYEV, whom OFAC had listed as a Specially Designated National, and to and for the benefit of companies owned and controlled by MALOFEYEV, and caused United States persons to receive funds, goods, and services from MALOFEYEV, and from companies owned and controlled by MALOFEYEV, and did and attempted to transfer, pay, export, withdraw, and otherwise deal in interests in property in the United States held by MALOFEYEV, without first obtaining the required approval of OFAC, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201, and engaged in and attempted to engage in transactions that evaded and avoided and caused a violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662, and Title 31, Code of Federal Regulations § 589.201)

## COUNT TWO

**(Violation of the International Emergency Economic Powers Act)**

The Grand Jury further charges:

36.   The allegations set forth above in Paragraphs 1 through 33 are realleged and incorporated by reference as if set fully forth herein.

37.   From at least in or about December 2014 through in or about December 2018, in the Southern District of New York and elsewhere, KONSTANTIN MALOFEYEV, the defendant, unlawfully, willfully, and knowingly violated the IEEPA, and the regulations promulgated thereunder, to wit, MALOFEYEV willfully and knowingly caused United States persons to provide funds, goods, and services to and for the benefit of MALOFEYEV, whom OFAC had listed as a Specially Designated National, and to and for the benefit of companies owned and controlled by MALOFEYEV, and caused United States persons to receive funds, goods, and services from MALOFEYEV, and from companies owned and controlled by MALOFEYEV, and did and attempted to transfer, pay, export, withdraw, and otherwise deal in interests in property in the United States held by MALOFEYEV, without first obtaining the required approval of OFAC, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201, and engaged in and attempted to engage in transactions that evaded and avoided and caused a violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders
13660, 13661, and 13662, and Title 31, Code of Federal
Regulations § 589.201)

## **FORFEITURE ALLEGATION**

38. As a result of committing the offenses alleged in
Counts One and Two of this Indictment, KONSTANTIN MALOFEYEV, the
defendant, shall forfeit to the United States, pursuant to Title
18, United States Code, Section 981(a)(1)(C), and Title 28, United
States Code, Section 2461, all property, real and personal, which
constitutes or is derived from proceeds traceable to the commission
of the offenses alleged in Count One and Count Two, including but
not limited to a sum of money in United States currency
representing the amount of proceeds traceable to the commission of
said offenses.

## **Substitute Asset Provision**

39. If any of the property described above as being
subject to forfeiture, as a result of any act or omission of
KONSTANTIN MALOFEYEV, the defendant,

a. cannot be located upon the exercise of due
diligence;

b. has been transferred or sold to, or
deposited with, a third party;

c. has been placed beyond the jurisdiction of
the court;

19

d.   has been substantially diminished in value;

or

e.   has been commingled with other property

which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United

States Code, Section 853(p); and Title 28, United States Code,

Section 2461 to seek

forfeiture of any other property of the defendants up to the value

of the forfeitable property described above.

(Title 18, United States Code, Sections 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)


FOREPERSON

DAMIAN WILLIAMS
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

KONSTANTIN MALOFEYEV

Defendant.

### SEALED INDICTMENT

S1 21 Cr. 676 (LAK)

(50 U.S.C. § 1705; Executive Orders 13660, 13661, and 13662; 31 C.F.R. § 589.201; 18 U.S.C. § 1001)

DAMIAN WILLIAMS
United States Attorney.

*Foreperson.*

Filed Superceding Indictment under seal.

4/4/22 An arrest warrant was issued.

DSMJ Willis